**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

CARLOS PEREZ,

                              Plaintiff,

        v.                                          No. 10-CV-518
                                                      (LEK/CFH)
D. KEYSOR, Deputy Superintendent of Administration,
Clinton Correctional Facility; D. HOLDRIDGE,
Captain, Clinton Correctional Facility; MILLER,
Lieutenant, Clinton Correctional Facility, R. FURNIA,
Sergeant, Clinton Correctional Facility; K. RABIDEAU,
Clinton Correctional Facility; D. DUQUETTE, Clinton
Correctional Facility; S. TOUSIGNANT, Clinton
Correctional Facility; ST. LOUIS, Clinton Correctional
Facility; MUSSEN, Clinton Correctional Facility,

                              Defendants.[1]
_____

**APPEARANCES:**                    **OF COUNSEL:**

CARLOS PEREZ
Plaintiff Pro Se
07-A-1342
Great Meadow Correctional Facility
Post Office Box 51
Comstock, New York 12821

HON. ERIC T. SCHNEIDERMAN          GREGORY J. RODRIGUEZ, ESQ.
Attorney General for the           Assistant Attorney General
    State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

_____

        [1]  By Decision and Order dated March 30, 2012, the Court dismissed defendants
Fischer, Artus, LeClaire, Racette and all "John/Jane Doe" defendants from this action.
Dkt. No. 51 at 2–3.

**REPORT-RECOMMENDATION AND ORDER**[2]

Plaintiff pro se Carlos Perez ("Perez"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, nine DOCCS employees, violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. Compl. (Dkt. No. 1). Presently pending is defendants' second motion for summary judgment pursuant to Fed. R. Civ. P. 56. Dkt. No. 77. Perez opposes this motion. Dkt. Nos. 82, 95. Defendants replied to Perez's opposition. Dkt. No. 85. For the following reasons, it is recommended that defendants' motion be granted in part and denied in part.

## I. Background

By Decision and Order dated March 30, 2012, the Court dismissed Perez's conspiracy claims against defendants Keysor and Miller and First Amendment access to courts and Sixth Amendment claims. Dkt. No. 51 at 2–3. The facts discussed will be those relevant to the claims herein remaining. Those claims occurred during Perez's incarceration at Clinton Correctional Facility ("Clinton").

### A. Failure to Protect

From approximately December 15, 2008 through January 26, 2009, Perez, through his court appointed attorney Barry Stendig of Appellate Advocates, filed grievances to, <u>inter</u>

---

[2] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

_alia_, the inmate grievance review committee [3] and non-party Commissioner Brian Fischer,

complaining "that [Perez's] life was in danger by numerous Correction[s] Officers and/or

Prison Officials at Clinton [who] . . . had been constantly harassing and threatening to beat

up [Perez] . . . ."  Compl. ¶ 69; see, e.g., Dkt. No. 95-3 at 16–39, 41–48, 52–61, 74–81.

Additionally, there was an alleged pattern and large number of incidents involving use of

force against inmates.  Compl. ¶¶ 72–74.  Despite these pleas for help and Clinton's

supposed history with excessive force, Holdridge took no action.  Id. ¶ 70.

According to Holdridge, on or about February 5, 2009, non-party Racette, deputy

superintendent of security, directed him to investigate Perez's allegations contained in a

letter addressed to DOCCS's Inspector General, dated January 17, 2009, but received by

Clinton on February 5, 2009.  Holdridge Decl. (Dkt. No. 77-8) ¶ 5; Dkt. No. 77-8 at 7–14.

Perez alleged that Rabideau issued him a misbehavior report in retaliation for filing a

grievance against him and denied him law library call-outs.  Holdridge Decl. ¶ 6.

Holdridge's review of Perez's prison file indicates that Holdridge did not receive Perez's

complaints that he feared for his safety prior to February 5, 2009.  Holdridge Decl. ¶ 8.

After reviewing Perez's January 17 letter, Holdridge directed non-party Guynup to conduct

an investigation into Perez's allegations.  Id. ¶ 10; Dkt. No. 77-8 at 16.  In his February 18,

2009 memorandum to Holdridge, Guynup reported that he had already interviewed Perez

on January 8, 2009 regarding the letter and Perez informed Guynup that he had nothing to

---

[3]  The DOCCS "IGP [Inmate Grievance Program] is a three-step process that requires an inmate to:  (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3) appeal to the CORC [Central Office Review Committee] . . . within four working days of receipt of the superintendent's written response."  Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir. 2004) (internal citations omitted).

add to that letter.  Holdridge Decl. ¶ 12; Dkt. No. 77-8 at 18.  Based on Guynup's

investigation, it was determined that Perez could not provide evidence or witnesses to

support the allegations made in the January 17, 2009 letter and the staff denied Perez's

allegations.  Holdridge Decl. ¶ 13; Dkt. No. 77-8 at 21.


### B.  Misbehavior Report Dated December 15, 2008[4]

On December 15, 2008, defendant Rabideau authored a misbehavior report against

Perez for being disruptive in the law library.  Perez Dep. (DKt. No. 77-3 at 4–185) at

19:22–20:6.[5]  Perez contends that Rabideau was a male officer and allegations in that

report were false.  Id. at 22:24–25, 39:6–12.  Perez was placed in keeplock for fourteen to

fifteen days before having this misbehavior report was dismissed.  Id. at 36:10–37:10.  After

filing several grievances against Rabideau, Perez was permitted to return to the library

around mid-January 2009.  Id. at 43:3–44:19.  From mid-January until February 3, 2009,

Perez did not encounter any problems with Rabideau.  Id. at 44:20–25.

On February 21, 2009, Perez received a memorandum from Holdridge indicating that

---

[4]  Non-party Gardner, a disciplinary lieutenant at Shawangunk Correctional Facility,
reviewed Perez's disciplinary history records for purposes of this action.  Gardner Decl.
(Dkt. No. 77-6) ¶¶ 1, 3.  According to Gardner, while housed at Sing Sing Correctional
Facility on October 9, 2007, Perez was charged with and found guilty for damaging
property and making an unauthorized exchange.  Gardner Decl. ¶ 5; Dkt. No. 77-6 at 5–7.
While housed at Midstate Correctional Facility on April 16, 2008, Perez was issued two
misbehavior reports, one for engaging in a fight and another for possessing a weapon.
Gardner Decl. ¶ 6; Dkt. No. 77-6 at 9–12.  As a result, Perez was found guilty and served
180 days of Special Housing Unit ("SHU") confinement.  Gardner Decl. ¶ 6; see note 10
infra on definition of SHU.  Perez was in SHU from April 23, 2008 to September 20, 2008.
Gardner Decl. ¶ 7; Dkt. No. 77-6 at 15.

[5]  The page numbers following "Perez Dep." refer to the pagination of the header
numbers generated by CM/ECF, not the individual transcripts.

Perez's "staff complaint, grievance and letter . . . ha[ve] been investigated on at least two separate occasions . . . ." Dkt. No. 45-2 at 39. Holdridge addressed the "reported multiple acts of misconduct, [which] are the fault of [Rabideau], in retaliation for you filing a grievance. Staff ha[ve] gone on record denying [the] allegations and there is no evidence or witnesses to support the allegations of your letter . . . ." Id. Holdridge concluded by indicating that all investigations into the staff misconduct were closed absent new evidence. Id.

According to non-party Gregory, the Inmate Grievance Program Supervisor at Clinton, a review of Clinton's records shows that Perez lodged only one complaint against Rabideau prior to February 3, 2009. Gregory Decl. (Dkt. No. 77-7) ¶¶ 1, 4. That complaint was filed December 17, 2008, alleging that Rabideau harassed Perez in the law library on December 15, 2008 in order to deny him access to the library.[6] Gregory Decl. ¶ 5; Dkt. No. 77-7 at 4–8.

### C. Excessive Force and Medical Indifference

At approximately 8:30 p.m. on February 3, 2009, defendant St. Louis escorted Perez from the law library back to Perez's cell. Compl. ¶ 22. All inmates being escorted from the

---

[6] In an interdepartmental communication, Rabideau maintained that he counseled Perez, on numerous occasions, to cease his habit of speaking with other inmates during callouts as such behavior disrupts other inmates from completing their legal work. Dkt. No. 77-7 at 12. Non-party Sergeant Guynup interviewed two inmates who were present in the law library when the alleged incident occurred. Id. at 13. Inmate Jordan claimed he saw Perez in the library and started to talk to him, at which point Rabideau gave Perez an order to stop talking loudly. Id. Inmate Madison told Guynup that he never heard Rabideau use vulgar language and heard Rabideau give Perez an order to stop talking in the library. Id.

library were required to pass through a metal detector prior to arriving at their housing unit. Id. ¶ 23. Defendants Rabideau and Duquette assisted St. Louis with the metal detector. Id. ¶ 24. Perez took off his watch and passed through the detector without activating it, but Rabideau and Duquette ordered Perez to the wall to be frisked, claiming that he had triggered the metal detector. Id. ¶¶ 24–25; Perez Dep. 58:1–8. Perez saw Duquette "passing [a walkie-talkie] . . . through the detector after [he] went through, so it could ring," which was also witnessed by Rabideau. Perez Dep. 58:8–12, 64:3–7. Rabideau ordered Duquette to pat-frisk Perez while he took all of Perez's legal work for personal inspection. Compl. ¶ 26. Rabideau then made the statement that Perez had filed many grievances and complaints against Rabideau. Id. ¶ 27. Rabideau also exclaimed that Perez had a weapon hidden amongst his legal documents and ordered Duquette to place mechanical restraints on Perez. Id.[7]

Defendant Furnia, the area sergeant, was then notified of the situation and Rabideau ordered another corrections officer to escort the rest of the inmates back to their cell-blocks. Compl. ¶¶ 28–29. After the other inmates left, Rabideau, Duquette, St. Louis, and Furnia surrounded Perez and Rabideau threatened Perez, stating that he was aware of all of the grievances that were being filed against him and the other Clinton officers and recommended that Perez cease the filings. Id. ¶¶ 29–30. Perez asked Rabideau to clarify what he meant whereupon Rabideau, Furnia and Duquette pulled Perez to the floor and, along with St. Louis and Tousignant, began kicking and punching Perez throughout the

---

[7] In the unusual incident report, the weapon was described as a "sharpened . . . plastic shank type weapon with a cloth handle," wrapped in a paper towel. Dkt. No. 1-6 at 5.

head and body for approximately two minutes.  Id. ¶¶ 31–34; Perez Dep. at 81:2–83:4. Rabideau and Furnia also told Perez, while they were assaulting him, that he would face additional charges.  Compl. ¶ 33.

Rabideau and Duquette then dragged Perez to the facility hospital.  Compl. ¶ 35; Perez Dep. 87:15–25.  Perez was taken into a room by Furnia and Tousignant for a strip-frisk during which time Rabideau, Duquette and St. Louis left.  Compl. ¶¶ 36–37.  Furnia and Tousignant completed the strip-frisk and Tousignant reapplied the mechanical restraints behind Perez's back.  Id. ¶ 38; Dkt. No. 1-6 at 8, 10 (memoranda reporting that Tousignant strip-frisked Perez under Furnia's direction); Dkt. No. 1-6 at 13 (report of strip frisk).  An unidentified nurse then entered the room, asking Perez if he was alright.  Compl. ¶ 39. Furnia responded that they were just there for a strip-frisk since Perez was found to be in possession of a weapon, but Perez quickly added that he had been framed and physically assaulted prior to being brought to the hospital.  Id. ¶¶ 40–41.  Furnia ordered the unidentified nurse to leave, while Furnia and Tousignant again assaulted Perez, knocking him unconscious and requiring the nurse to awaken him with smelling salts.  Id. ¶¶ 42–44; Perez Dep. at 101:17–25.  After reviving Perez, the nurse left the room.  Compl. ¶ 45. Furnia and Tousignant then escorted Perez to solitary confinement in restricted housing without any further medical intervention for the injuries Perez sustained to his head, neck, arms and legs or the extreme pain he was experiencing.  Id. ¶¶ 46–47.

For two days, Perez remained in his cell and suffered from severe pain despite his pleas to the patrolling corrections officers for medical care.  Compl. ¶ 48; Perez Dep. at 113:22–114:10.  Perez requested medical care from Furnia and Tousignant during the escort back to his cell, which was also denied.  Perez Dep. at 114:11–23.

On February 5, 2009, Perez was taken to a mental health examination where the social worker, upon seeing Perez's physical condition, rushed him to the infirmary for medical treatment. Compl. ¶¶ 50–52. Perez was eventually interviewed and photographs of his injuries were taken. Id. ¶¶ 53–55; Perez Dep. at 125:1–4. Perez was given a shot for neck and back pain, had developed a black eye and injuries to his neck and back, and discovered he was beginning to suffer from arthritis.[8] Compl. ¶ 56; see also Dkt. No. 45-2 at 47 (inmate injury report noting a bruise on Perez's left side and neck, swelling on his neck, and pain in his neck and back), 48 (same). After Perez's pain medication ran-out, an unidentified doctor failed to provide him with more of the same medication, and instead, gave him over-the-counter pain relievers. Compl. ¶¶ 57–58. Perez contends that Furnia, Rabideau, Tousignant, St. Louis, and Duquette denied him medical attention because they assaulted him and failed to provide him medical treatment. Perez Dep. at 124:11–25.

Defendants have a different account of these events. It is undisputed that on February 3, 2009, Rabideau and Duquette were processing inmates returning from a law library call-out. Rabideau Decl. (Dkt. No. 77-13) ¶¶ 1, 5–6; Duquette Decl. (Dkt. No. 77-4) ¶ 8. However, Duquette did not take any action to cause Perez to activate the metal detector. Duquette Decl. ¶¶ 9–11. Rabideau, a female law library officer, believes that Perez activated the metal detector with a watch he was wearing. Rabideau Decl. ¶¶ 5–7.

Duquette was the only individual who pat-frisked Perez's body and legal documents, then found and confiscated the weapon. Duquette Decl. ¶¶ 12–14; Rabideau Decl. ¶ 8; Dkt. Nos. 1-6 (unusual incident report) at 6, 77-4 (misbehavior report) at 6. Duquette

---

[8] Perez contends his back pain persists at least until August 28, 2012, the date of Perez's deposition. Perez Dep. at 128:9–20.

attested that while he was pat-frisking Perez, Perez's legal materials were placed on a desk nearby and no one tampered with them. Duquette Decl. ¶¶ 15–17. Duquette was unaware of a grievance that Perez lodged against Rabideau. Id. ¶ 18. Duquette authored the misbehavior report against Perez not as a retaliatory action but because he discovered a weapon in Perez's legal materials. Id. ¶ 25. Duquette and Rabideau maintain they did not assault Perez, witness other officers assault Perez, place the weapon in Perez's legal materials or witness any Clinton security personnel place a weapon in Perez's legal materials, carry out retaliatory actions against Perez for filing grievances against Rabideau, and did not escort Perez to the facility hospital. Id. ¶¶ 16–17, 21, 23, 25; Rabideau Decl. ¶¶ 12–14, 17, 19.

It was Tousignant, under Furnia's supervision, who escorted Perez to the facility hospital to be strip frisked. Duquette Decl. ¶¶ 22–23; Furnia Decl. (Dkt. No. 77-5) ¶¶ 7, 11. Perez was not dragged to the hospital and during the transport, Perez did not indicate that he was in pain, injured, or required medical treatment. Furnia Decl. ¶¶ 12–16; see Dkt. No. 77-5 at 8–13 (unusual incident report documenting the absence of use of force and medical issued related to the discovery of the weapon). Tousignant strip-frisked Perez in an exam room and no contraband was found. Furnia Decl. ¶ 8; Dkt. No. 77-5 at 20, 24. Perez was interviewed, made no statement, and was escorted to his cell without incident. Furnia Decl. ¶¶ 9–10.

Furnia maintains that he never assaulted Perez or witnessed Perez being assaulted, had no knowledge of a grievance that Perez lodged against Rabideau, and never retaliated against Perez for any reason. Furnia Decl. ¶¶ 17–18, 20. Furnia attested that upon reviewing the log book pages dated February 3, 4, and 5 of 2009 for Perez's cell block, he

concludes that Perez never sought medical attention from any security staff member. Id. ¶¶ 22–24, 32. Furnia supports this conclusion by attesting that a number of individuals were on Perez's cell-block and never received a medical request from Perez.[9] Id. ¶¶ 25–31.

Tousignant, a corrections officer, was directed by Furnia to escort Perez to the facility hospital. Tousignant Decl. (Dkt. No. 77-15) ¶¶ 1, 6. Tousignant was accompanied only by Furnia and maintains the escort was uneventful. Id. ¶¶ 7–8. Perez did not complain about being in pain, limp, bleed, or suffer from any injury. Id. ¶ 9. Tousignant strip frisked Perez in an exam room and did not find any contraband. Id. ¶ 10; Dkt. No. 77-15 at 6–7. Tousignant did not recall that a nurse was present during the strip frisk because a nurse would only be present if there was a use of force incident or Perez indicated he was suffering from an injury. Tousignant Decl. ¶¶ 11–12. Tousignant then escorted Perez back to the cell block without incident and Perez neither complained about being in pain or injured nor in need of medical attention. Id. ¶¶ 13–14. Tousignant maintains he did not use force on Perez, did not witness any security personnel use force on Perez, was unaware of Perez's grievance against Rabideau, and did not retaliate against Perez in any way. Id. ¶¶ 15–18.

St. Louis maintains that he did not escort Perez to the facility hospital, assault Perez, witness other security personnel assault Perez, was unaware of Perez's grievance against Rabideau, and did not retaliate against Perez in any way. St. Louis Decl. (Dkt. No. 77-14) ¶¶ 1, 5, 10–14.

---

[9] These individuals include: an insulin nurse; a medical nurse; a sergeant; a psychiatric nurse; the unit chief with the Office of Mental Health; and a social worker with the Office of Mental Health. Furnia Decl. ¶¶ 25–31; Dkt. No. 77-5 at 31–34.

After Perez was found with a weapon, Mussen, a corrections officer, was directed by Furnia to search Perez's cell.  Mussen Decl. (Dkt. No. 77-11) ¶¶ 1, 7–8.  Mussen explained that each inmate is accountable for the one state-issued razor that is provided to him or her upon entry to Clinton.  Id. ¶ 12.  Mussen issued a misbehavior report against Perez because Perez's state-issued razor was missing from his cell.  Id. ¶¶ 13–14; Dkt. No. 77-11 at 7.  Perez contended that had Mussen testified at his disciplinary hearing, Mussen would have stated that he did not search Perez's eyeglass case, which held the razor.  Mussen Decl. ¶¶ 17.  However, Mussen attested he thoroughly frisked Perez's cell, which entailed searching through Perez's clothing, legal materials and books, property under the bed, and locker.  Id. ¶¶ 8–9.  Based on the Personal Property Transferred Form, Mussen maintains Perez did not have an eyeglass case on February 3, 2009.  Id. ¶ 11; Dkt. No. 77-11 at 9.  Mussen further attested that he did not issue the misbehavior report in retaliation, has never carried out retaliatory action against Perez, worked in a separate unit from Rabideau during February 2009, and was unaware of Perez's grievance against Rabideau.  Mussen Decl. ¶¶ 15, 19–20.

### D.  Medical Treatment and Injuries

On February 5, 2009, non-parties Nurse Fitzgerald and Dr. Lee saw Perez for Perez's complaints of a staff-assault that occurred February 3, 2009.  Dkt. No. 78 at 6; Adams Decl. (Dkt. No. 78) ¶¶ 1–2, 6.  Fitzgerald noted a bruise on Perez's left shoulder and neck area, redness in the back of Perez's neck, and Perez's head was tilted to the left and he could

not straighten it when an X-ray was taken.[10]  Dkt. No. 78 at 6; Adams Decl. ¶ 6.  A

psychiatric nurse was notified to review Perez's psychiatric medications and Dr. Lee gave

Perez a shot for extrapyramidal symptoms.[11]  Dkt. No. 78 at 6; Adams Decl. ¶ 6.  On

February 7, 2009, Perez was seen at emergency sick call with a tilted head, was given

Ibuprofen, and ordered medical bed rest for three days.  Dkt. No. 78 at 6; Adams Decl. ¶ 6.

On February 9, 2009, non-party Adams, a DOCCS medical doctor, examined Perez

and noted that Perez had a small light brown area around the nape of the neck which was

consistent with a two to three day old contusion requiring no treatment.  Adams Decl. ¶ 8;

Dkt. No. 78 at 7.  Perez was provided Flexerol for neck pain.  Adams Decl. ¶ 8; Dkt. No. 78

at 7.

On February 13, 2009, Perez's anti-seizure medications were reviewed for a court trip.

Dkt. No. 78 at 8; Adams Decl. ¶ 9.  During the court trip, Perez was housed at Auburn

Correctional Facility, where he was seen at sick call complaining of pain in the left side of

his neck and was given Ibuprofen.  Dkt. No. 78 at 9; Adams Decl. ¶ 10.

On March 3, 2009, Perez returned to Clinton and his health record entry dated March

17, 2009 indicated Perez did not have medical problems.  Dkt. No. 78 at 11; Adams Decl. ¶

11.  On June 8, 2009, an X-ray taken of Perez's cervical spine indicated no fracture or

dislocation.  Dkt. No. 78 at 12; Adams Decl. ¶ 12.

---

[10]  Photos taken of Perez largely confirms Fitzgerald's observations.  Dkt. No. 78-1
at 10–15.

[11]  According to Adams, "[e]xtrapyramidal symptoms are various movement
disorders or reactions as a result of taking antipsychotic drugs."  Adams Decl. ¶ 6.

### E.  Disciplinary Hearings and Appeals

On February 6, 2009, Perez was escorted to a hearing room for two disciplinary

hearings scheduled as a result of the two misbehavior reports which Duquette[12] and

Mussen had issued on February 3, 2009.  Compl. ¶¶ 59–60.  The hearings were conducted

by defendants Keysor and Miller, both of whom were biased, denied Perez the opportunity

to present a defense, and failed to provide adequate assistance.  Id. ¶¶ 61–64.  Miller found

Perez guilty of losing his property and sentenced him to thirty days of keeplock and loss of

privileges, effective from February 3, 2009 through March 5, 2009.  Miller Decl. (Dkt. No.

77-10) ¶¶ 9–10; Dkt. Nos. 1-7 at 1, 77-10 (hearing transcript) at 10–11.  Keysor found

Perez guilty of possessing a weapon and smuggling his state issued razor.  Compl. ¶ 67;

Dkt. No. 1-6 at 32.  Keysor relied on Duquette's misbehavior report and testimony from

Duquette and Rabideau which she deemed credible.  Dkt. No. 1-6 at 33.  Perez was

sentenced to six months in the Special Housing Unit ("SHU")[13] and six months loss of

privileges.  Dkt. No. 1-6 at 32; Compl. ¶ 67.

According to Keysor, Perez initially met with his chosen inmate assistant on February 5,

2009 but refused to endorse the Assistant Form.  Keysor Decl. (Dkt. No. 77-9) ¶ 8; Dkt. No.

77-9 at 28–29.  Keysor began the Tier III hearing on February 6, 2009.  Keysor Decl. ¶ 9.

At the onset of the hearing, Perez advised Keysor that he was dissatisfied with the

---

[12]  Duquette's misbehavior report cited Perez with smuggling and possession of a
weapon.  Dkt. No. 1-6 at 11.

[13]  SHUs exist in all maximum and certain medium security facilities.  The units
"consist of single-occupancy cells grouped so as to provide separation from the general
population . . . ."  N.Y. COMP. CODES R. & REGS. tit. 7, § 300.2(b).  Inmates are confined in
a SHU as discipline, pending resolution of misconduct charges, for administrative or
security reasons, or in other circumstances as required.  Id. at pt. 301.

assistance his received. Keysor Decl. ¶ 10; Dkt. No. 77-9 at 35. Keysor read the

misbehavior report into the record and asked Perez how he pled to the charges against

him. Keysor Decl. ¶ 11; Dkt. No. 77-9 at 35–36. Perez signed the hearing record sheet to

record his pleas to the charges against him and Keysor adjourned the hearing so that Perez

could get necessary assistance for his defense. Keysor Decl. ¶ 11; Dkt. No. 77-9 at 36.

Keysor reconvened the hearing on February 13, 2009 and confirmed that Perez met

with one of his chosen assistants and received assistance on February 9, 2009. Keysor

Decl. ¶ 12; Dkt. No. 77-9 at 36. Keysor permitted Perez to summarize on-the-record his

hearing testimony statement. Keysor Decl. ¶ 13; Dkt. No. 77-9 at 36–41. Perez's

requested witnesses, Furnia, Duquette, Rabideau, and Tousignant, all testified as

witnesses. Keysor Decl. ¶¶ 14–15; Dkt. No. 77-9 at 41–55. When Duquette testified, Perez

raised questions about his testimony. Keysor Decl. ¶ 16; Dkt. No. 77-9 at 57. Keysor had

Duquette return to clarify his prior testimony. Keysor Decl. ¶ 16; Dkt. No. 77-9 at 57–62.

After reviewing documentation that Perez had submitted to his assistant, Keysor

attempted to call three random inmates who were on library call-out on February 3, 2009.

Keysor Decl. ¶ 17; Dkt. No. 77-9 at 55. However, those inmates refused to testify and

signed witness refusal forms. Keysor Decl. ¶ 18; Dkt. No. 77-9 at 62–63, 70–72. Perez

requested to call a nurse he claimed was in the hospital examining room to testify. Keysor

Decl. ¶ 19. Keysor considered Perez's theory that Perez was issued the misbehavior report

as retaliation for filing grievances against Rabideau; however, because the unidentified

nurse did not observe the alleged misbehavior, Keysor concluded her testimony was not

relevant and denied Perez's request. Keysor Decl. ¶¶ 19–23; Dkt. No. 77-9 at 74 (witness

interview notice). Relying on the misbehavior report and testimonies by Rabideau and

Duquette, Keysor found Perez guilty and imposed six-months of SHU confinement along with loss of recreation, packages, commissary, phone privileges, and good time credits. Keysor Decl. ¶¶ 24–25; Dkt. No. 77-9 at 77.

On March 4, 2009, Perez filed an appeal to non-party Artus seeking reversal of Miller's finding of guilt. Dkt. No. 1-7 at 1–10. On March 10, 2009, Holdridge affirmed Perez's conviction and sentence. Id. at 11. On June 22, 2009, Perez initiated an Article 78 proceeding[14] to challenge the determination. Dkt. Nos. 1-8, 45-2 at 52. The state court proceeding was dismissed because "[o]n December 29, 2009, the determination was reversed and expunged based upon state law involving administrative issues." Mastracco Aff. (Dkt. No. 1-9) ¶ 7; see also id. ¶ 8; Dkt. No. 1-10 at 1 (letter reversing and expunging conviction); Dkt. No. 45-2 at 51–52 (Decision and Order dated January 15, 2010 dismissing state case).

On March 29, 2009, Perez filed an appeal to the unnamed Director of Special Housing seeking reversal of the disciplinary hearing Keysor conducted beginning on February 6, 2009. Dkt. No. 1-1. The superintendent's hearing was initially affirmed on April 24, 2009. Dkt. No. 1-2 at 2. Perez filed a petition in state court seeking to have his conviction reversed. Dkt. No. 1-2 at 10–66; Dkt. No. 1-11. Eventually, Keysor's finding of guilt was administratively reversed and expunged from Perez's record on March 22, 2010 for Keysor "inappropriate[ly] deni[ed] . . . a potentially relevant witness regarding the inmate's retaliation defense." Compl. ¶ 68; Prack Decl. (Dkt. No. 77-12) ¶¶ 4–5; Dkt. Nos. 1-2 at 6, 45-2 at 50, 77-12 at 5.

---

[14] N.Y. Civil Practice Law and Rules Art. 78 establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

## II. Discussion

Perez contends that: (1) defendants Duquette, Mussen, and Holdridge violated his First Amendment right against retaliation for filing grievances; (2) defendants Rabideau, Duquette, Tousignant, Furnia, and St. Louis violated his Eighth Amendment right against the use of excessive force; (3) defendants Rabideau, Duquette, Tousignant, Furnia, and St. Louis violated his Eighth Amendment right by exhibiting deliberate indifference to his medical needs; (4) defendant Holdridge violated his Eighth Amendment right by failing to protect him from Clinton's security staff; (5) defendants Keysor and Miller violated his Fourteenth Amendment due process rights during his disciplinary hearings; and (6) defendants Duquette and Mussen violated his Fourteenth Amendment rights by authoring false misbehavior reports. Defendants contend that Perez's constitutional claims are meritless and that Holdridge and Keysor are entitled to qualified immunity.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

16

The party opposing the motion must set forth facts showing that there is a genuine issue for trial.  The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d 1219, 1223–24 (2d Cir. 1994); <u>Graham v. Lewinski</u>, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  <u>See</u> <u>Triestman v. Fed. Bureau of Prisons</u>, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally,". . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . .  At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . ."

<u>Id.</u> (citations and footnote omitted); <u>see also</u> <u>Sealed Plaintiff v. Sealed Defendant #1</u>, 537 F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds <u>pro se</u>, . . . a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.  <u>Anderson</u>, 477 U.S. at

17

247–48.

## B. Second Motion for Summary Judgment &
## Law of the Case

Perez contends that defendants' second motion for summary judgment should be dismissed because defendants already filed such a motion on August 8, 2011, which was decided upon on March 30, 2012. Perez Reply (Dkt. No. 82) at 1.

A successive motion for summary judgment may be procedurally improper if it presents no new facts and seeks to raise arguments that could have been raised in the first motion. Brown v. City of Syracuse, 673 F.3d 141, 147 n.2 (2d Cir. 2012) (quoting Campers' World Int'l, Inc. v. Perry Ellis Int'l, Inc., 221 F.R.D. 409, 409 (409 (S.D.N.Y. 2004)). Nevertheless, district courts may use their discretion in considering successive dispositive motions. Id. (quoting Kovacevich v. Kent State Univ., 224 F.3d 806, 835 (6th Cir. 2000) ("District courts may in their discretion permit renewed or successive motions for summary judgment, particularly when the moving party has expanded the factual record on which summary judgment is sought.")); Sira v. Morton, 380 F.3d 57, 68 (2d Cir. 2004) (citing the same). Here, defendants did not address Perez's First and Eighth Amendment claims in their first motion for summary judgment. Dkt. No. 48 at 14 n.10. However, given that "[d]efendants primarily rel[ied] on the failure to exhaust as the basis for the [first] motion" and expanded the factual record by conducting discovery, including deposing Perez, defendants had reason to move again for summary judgment after the completion of discovery. Id.; Brown, 673 F.3d at 147 n.2.

Further, in his supplemental response, Perez contends that, pursuant to the law of the

case doctrine, defendants cannot again make certain arguments that were made in their first motion for summary judgment and already decided by the Court.  See, e.g., Perez Suppl. Resp. (Dkt. No. 95-2) at 8, 11–14.  In applying the law of the case doctrine, courts have long recognized the distinction between pre-discovery motions, based on an undeveloped record, and post-discovery motions for summary judgment.  See, e.g., DiLaura v. Power Authority, 982 F.2d 73, 76–77 (2d Cir. 1992) (findings made by a court for the purpose of injunctive relief are not the law of the case for subsequent litigation on the merits); Clalit Health Serv. v. Israel Humanitarian Found., 385 F. Supp. 2d 392, 398 n. 8 (S.D.N.Y. 2005) (holding that a pre-discovery determination on a motion to dismiss not the law of the case for purposes of summary judgment).  Here, the first motion for summary judgment was based on an undeveloped record.  After discovery closed, defendants filed this present summary judgment motion.  Thus, the determination on the first motion for summary judgment is not the law of the case for purposes of the second motion for summary judgment.

Accordingly, Perez's contentions on these grounds should be denied and the Court will consider defendants' arguments in their second motion for summary judgment.


### C.  First Amendment

To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that:  (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action.  Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks and citation

omitted); <u>Tafari v. McCarthy</u>, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010). In the prison

context, "adverse action" is objectively defined as conduct "that would deter a similarly

situated individual of ordinary firmness from exercising . . . constitutional rights." <u>Davis v.</u>

<u>Goord</u>, 320 F.3d 346, 353 (2d Cir. 2003). "[A]dverse action taken for both proper and

improper reasons may be upheld if the action would have been taken based on the proper

reasons alone." <u>Jackson v. Onondaga Cnty.</u>, 549 F. Supp. 2d 204, 215 (N.D.N.Y. 2008).

"Types of circumstantial evidence that can show a causal connection between the

protected conduct and the alleged retaliation include temporal proximity, prior good

discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as

to their motives." <u>Barclay v. New York</u>, 477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations

omitted).

> There is no bright line to define the outer limits beyond which a
> temporal relationship is too attenuated to establish a causal
> relationship, so courts judge the permissible inferences that can
> be drawn from temporal proximity in the context of particular
> cases. However, courts have found that six and eight month
> gaps between the protected conduct and adverse action were
> sufficient, while in other circumstances three months was
> considered too long.

<u>Burton v. Lynch</u>, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and

citations omitted).

Courts must view retaliation claims with care and skepticism to avoid judicial intrusion

into matters of prison administration. <u>Jackson</u>, 549 F. Supp. 2d at 214–15. Therefore,

conclusory allegations alone are insufficient. <u>Id.</u> at 214 (citing <u>Flaherty v. Coughlin</u>, 713

F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed

factual allegations . . . ought usually be pursued with full discovery.")). If the plaintiff

establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his exercising of the protected conduct. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

### 1. Duquette and Mussen

In this case, Perez has satisfied the first and second prongs of the First Amendment analysis. It is undisputed that Perez has satisfied the first prong of the First Amendment analysis for the filing of prison grievances is a constitutionally protected activity. Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996); Mateo v. Fischer, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010). Further, defendants also do not dispute that the filing of false misbehavior reports against Perez and his sentences of six-months in SHU and thirty days in keeplock constituted adverse action against Perez. Gill, 389 F.3d at 384 (finding the filing of false misbehavior reports that resulted in a sentence of three weeks in keeplock would deter a prisoner of ordinary firmness from vindicating his or her constitutional rights through grievances and lawsuits); Davis, 320 F.3d at 353.

As for the causal connection factor, Perez alleged that Duquette and Mussen issued him false misbehavior reports because he filed grievances against Rabideau on January 21, 2009. Defendants contend that the temporal proximity between the protected conduct and the alleged retaliatory conduct is too attenuated to establish a causal relationship. Defs.' Mem. of Law at 23–24. Perez filed a grievance against Rabideau on January 21, 2009 involving use of the law library and the alleged retaliatory conduct took place within two weeks on February 3, 2009, which has been held to sufficiently support an inference of

a causal connection. <u>Espinal v. Goord</u>, 558 F.3d 119, 129 (2d Cir. 2009) (citation omitted) (finding the passage of six months between the protected conduct and alleged retaliatory assault supported the inference of a causal connection). Defendants argue that Perez used the law library during this time period without any incident, which in turn, diminishes the weight attached to the temporal proximity between Perez's protected conduct and the alleged retaliatory acts. However, the absence of conflict or incident during this period does not do away the undisputed fact that an alleged assault occurred shortly after Perez lodged a grievance against Rabideau. Thus, this factor lends support in Perez's favor.

While there is appropriate temporal proximity between the alleged protected conduct and adverse action, "[i]n many circumstances . . . th[at] alone is insufficient to avoid summary judgment." <u>Webster v. Fischer</u>, 694 F. Supp. 2d 163, 183 (N.D.N.Y. 2010). Failure to prove Duquette and Mussen's knowledge of Perez's grievances against Rabideau, even in light of the temporal proximity, is fatal to Perez's claim. <u>Shaheen v. Filion</u>, No. 04-CV-625 (FJS)(DRH), 2006 WL 2792739, at *3 (N.D.N.Y. Sept. 17, 2006) (dismissing retaliation claim where inmate "provide[d] no evidence to demonstrate that any defendant had any knowledge of his complaints . . . prior to the filing of the misbehavior report," and to which defendants "provided a declaration stating that he or she was unaware of any of [the inmate's] writings that criticized prison officials and conditions."). Perez's conclusory and speculative allegations are contrary to the declarations of Duquette and Mussen, who claimed that they had no knowledge of such grievances. Perez alleged that Rabideau verbally declared, in Duquette's presence, that Perez possessed legal materials containing Rabideau's name. However, this verbal statement occurred subsequent to the metal detector's activation, which provided Duquette a reason to search Perez and his legal

materials. Duquette would not have garnered knowledge of the grievances from this statement alone. Therefore, beyond Perez's conclusory allegations, there is nothing in the record refuting the testimonies of Duquette and Mussen that they were not aware of Perez's grievances against Rabideau involving the law library.

Furthermore, this district has previously held that inmate actions alleging retaliation "against other prison employees elsewhere in the New York penal system," without providing additional factual allegations establishing knowledge and involvement, are insufficient to state a claim. Gonzales v. Wright, No. 06-CV-1424 (JMH), 2010 WL 681323, at *12 (N.D.N.Y. Feb. 23, 2010) (Dkt. No. 52-23 at 27); see also Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); Roseboro v. Gillespie, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (finding that the inmate "has failed to provide any basis to believe that [a corrections counselor] retaliated for a grievance that she was not personally named in.") (collecting cases). Moreover, Perez's disciplinary history, where he was charged with damaging property, making an unauthorized exchange, fighting, and possessing a weapon, only weakens the causal evidence in the record.

Lastly, while "[v]indication of the inmate after a hearing may constitute circumstantial evidence of defendant's retaliatory motive," Perez's disciplinary dispositions were reversed based on procedural grounds, not the because the charges against Perez were supported by insufficient evidence. Lashley v. Wakefield, 367 F. Supp. 2d 461, 468 (W.D.N.Y. 2005) (citing inter alia, Bennett v. Goord, 343 F.3d 133, 138 (2d Cir. 2003) (finding that summary judgment inappropriate when "essentially all relevant adverse actions by DOCS officials

were subsequently found to have been unjustified . . . not on procedural or technical grounds but because . . . they were found to have been devoid of factual support.")). Therefore, because defendants have shown through record evidence that there is an absence of factual issues with regard to the causal connection prong, Perez's retaliation claims against Duquette and Mussen are without merit. Celotex Corp., 477 U.S. at 323.

Accordingly, defendants' motion on this ground should be granted.

### 2. Holdridge

Perez contends that he had repeatedly informed Holdridge about being harassed by corrections staff but Holdridge refused to take action in retaliation for Perez lodging grievances against Rabideau. Perez Dep. at 148:21–149:7. Perez also testified during his deposition that Holdridge failed to properly investigate his claims of staff harassment in retaliation for his grievance received on February 3, 2009, filed against Rabideau. Id. at 147:20–149:7. However, despite these conclusory allegations, Perez does not make any factual allegations to support the causal connection between the grievance and the disposition of its investigation. Jackson, 549 F. Supp. 2d at 214–15. Perez cannot merely show there is some doubt as to the true nature of the facts surrounding his retaliation claim against Holdridge with wholly conclusory assertions. Matsushita Elec. Indus. Co., 475 U.S. at 586. Perez does not substantiate his assertions with any documentation addressed to Holdridge which concerned Rabideau. Further, Perez does not make further factual allegations or provide support to explain how Holdridge improperly investigated his grievance. A rational factfinder would not be able to find in favor of Perez based on such conclusory and unsubstantiated allegations. Gallo, 22 F.3d at 1223–24. As such, Perez's

24

retaliation claim against Holdridge is also without merit.

Accordingly, defendants' motion on this ground should be granted.

## D. Eighth Amendment

Perez contends that defendants Rabideau, Duquette, Tousignant, Furnia, and St. Louis violated his Eighth Amendment rights by using excessive force against him and exhibiting deliberate indifference to his medical needs. The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. Farmer v. Brennan, 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. Id. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

### 1. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. Hudson v. McMillian, 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." Gregg v. Georgia, 428 U.S. 153, 173 (1976); Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective

elements.  <u>Blyden v. Mancusi</u>, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." <u>Hudson</u>, 503 U.S. at 9 (internal citations omitted); <u>Blyden</u>, 186 F.3d at 262.  However, "the malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation <u>per se</u>" regardless of the seriousness of the injuries.  <u>Blyden</u>, 186 F.3d at 263 (citing <u>Hudson</u>, 503 U.S. at 9).  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition <u>de minimis</u> uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." <u>Hudson</u>, 503 U.S. at 9–10 (citations omitted).  "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" <u>Sims</u>, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." <u>Sims</u>, 230 F.3d at 21 (citation omitted).  The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" <u>Id.</u> (quoting <u>Hudson</u>, 503 U.S. at 7).  In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider:  "the extent of the injury and the mental state of the defendant[;] . . . the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." <u>Scott v. Coughlin</u>, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

Defendants contend that Perez's claims are insufficient to establish satisfy the objective prong of the Eighth Amendment analysis because Perez's injuries are de minimis and the claims are unsubstantiated. Perez contends that defendants assaulted him on two separate occasions on February 3, 2009. Perez further contends that while he was handcuffed from behind, Rabideau and Duquette threw him face first to the ground. Rabideau and Duquette, joined by St. Louis, Tousignant, and Furnia, proceeded to kick and punch him in the back, legs, arms, head, and face for approximately two minutes. While Perez was transported to the facility, he was dragged by his feet. Perez also contends that in the medical exam room, Furnia and Tousignant assaulted him until he became unconscious. Despite Perez's compliance with the pat-frisk and the examination, Perez claims to have been assaulted for two minutes for the first incident and five minutes for the second incident. Even though medical records do not confirm the injuries which Perez contends to have incurred, any or no injuries resulting from the events as described by Perez could represent a per se constitutional violation. See Baskerville v. Mulvaney, 411 F.3d 45, 48–49 (2d Cir. 2005). Thus, defendants' argument that Perez's injuries were merely de minimis cannot result in the dismissal of Perez's excessive force claims.

As for the subjective prong, defendants fail to show the absence of a genuine issue of material fact. Perez alleged the assaults were unprovoked and nothing in the record indicates that Perez behaved in any threatening manner posing a danger to officers or inmates. Thus, Perez's contentions that he was punched and kicked throughout the body were disproportionate to the amount of force required. If Perez's evidence is credited, a reasonable factfinder could find the actions of Rabideau, Duquette, St. Louis, Tousignant, and Furnia were wanton and malicious. The need for force in response to compliant and

27

non-threatening behavior could be deemed malicious. Perez's evidence would establish that the use of force was an unnecessary tactic implemented not to restore or maintain order, but to maliciously assault an inmate for no apparent reason, which could constitute a per se constitutional violation.

The competing evidence rests on the credibility of Perez on the one hand and defendants on the other. In these circumstances, the governing law that the evidence must be viewed in the light most favorable to the non-moving party directs the Court to credit Perez's version of events for purposes of this motion. See In re Dana Corp., 574 F.3d 128, 152 (2d Cir. 2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence, functions which are reserved to a jury and not a judge) (citing cases). Thus, viewing the facts in the light most favorable to Perez, he has proffered sufficient evidence to raise genuine issues of material fact as to the objective and subjective prong of the Eighth Amendment analysis.

Accordingly, defendants' motion on this ground should be denied.


### 2.  Medical Indifference

The Eighth Amendment prohibition extends to the provision of medical care. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. Farmer v. Brennan, 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. Id. "[P]rison officials who actually knew of a

substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003) (quoting Hudson v. McMillian, 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. Chance, 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . . are not adequate grounds for a section 1983 claim." Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

### a. Furnia and Tousignant

Perez claims that Furnia and Tousignant refused to permit him to leave his cell and seek medical attention. Here, Perez has established the objective prong to the medical indifference analysis. Perez made repeated requests for medical attention to Furnia and Tousignant. Perez's complaints caused Fitzgerald to exam Perez and Dr. Lee to provide him with pain relief medication. Perez's medical records indicate that Perez exhibited a bruise on Perez's left side and neck, swelling on his neck, and pain in his neck and back. Crediting Perez's requests for medical attention, as he perceived his medical need was worthy of comment, Perez has proffered sufficient evidence to raise an issue of fact as to the objective prong of the Eighth Amendment analysis to require resolution by a jury. Brock, 315 F.3d at 162–63.

Perez has also presented a genuine issue of fact with respect to the subjective prong of the test. Furnia and Tousignant had knowledge of Perez's medical need for Perez verbally informed them of such. Chance, 143 F.3d at 702. Perez further contends that Furnia and Tousignant refused to allow him to leave his cell for medical attention; thus, intentionally delaying Perez's access to medical attention. Estelle, 429 U.S. at 104. Even though Perez eventually saw Fitzgerald two days after the alleged assault, this opportunity was not provided by either Furnia or Tousignant. Further, the absence of sick-call entries does not vitiate against claims of deliberate indifference since part of Perez's claim is that Furnia and Tousignant prevented him from obtaining medical care. Moreover, Perez contends he made further efforts by attempting to receive medical assistance from patrolling officers; however, they disregarded his requests. Therefore, Perez has shown that factual issues exist with respect to the subjective prong of his medical indifference claim.

Accordingly, defendants' motion on this ground should be denied.

### b. Rabideau, Duquette, St. Louis

Although defendants do not bring this contention to the Court's attention, Perez claims in his deposition that Rabideau, Duquette, and St. Louis exhibited deliberate indifferent to his serious medical needs because they assaulted him without subsequently providing him with medical attention. While Perez rationalizes that Rabideau, Duquette, and St. Louis should have been aware that he was suffering from serious medical needs as a result of the alleged assault carried out by the same defendants, Perez does not allege that he informed them of his serious medical needs. Chance, 143 F.3d at 702. More importantly, this allegation is a mere afterthought during Perez's deposition. Thus, Perez has failed to make a showing against Rabideau, Duquette, and St. Louis such that a reasonable factfinder could find in his favor. Gallo, 22 F.3d at 1223–24.

Accordingly, Perez's medical indifference claims against Rabideau, Duquette, and St. Louis should be dismissed.

### 3. Failure to Protect

The Eighth Amendment also obliges corrections officers to protect Perez from known harms. Farmer v. Brennan, 511 U.S. 825, 829 (1970). "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Id. at 832. Where the inmate is alleging "a failure to prevent harm, the inmate must show that he is incarcerated under conditions

posing a substantial risk of serious harm." Id. at 834 (citing Helling v. McKinney, 509 U.S. 25, 31–32 (1993)).

As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and subjective test." Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted). To state a cognizable failure to protect claim, (1) "the inmate [must be] incarcerated under conditions imposing a substantial risk of serious harm," and (2) the prison office must "know of and disregard an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Matthews v. Armitage, 36 F. Supp. 2d 121, 124–25 (N.D.N.Y. 1999) (internal citations and quotations omitted).

Here, defendants challenge the subjective prong of Perez's failure to protect claim. Perez contends that Holdridge failed to protect him from Clinton corrections officers despite being notified of harassment and threats made to Perez. Perez contends he, through his attorney, filed numerous complaints to Holdridge complaining of Perez's safety at Clinton. A letter received on February 5, 2009 indicates that Holdridge was unaware of Perez's claims until after the alleged February 3, 2009 use of force incident. None of the other letters submitted to the Court were both filed against Rabideau and addressed to Holdridge. Thus, Perez has failed to show that Holdridge knew of the harm under which he was subjected and had the opportunity to cease or prevent such harm. Farmer, 511 U.S. at 829; Matthews, 36 F. Supp. 2d at 124–25.

Accordingly, defendants' motion on this ground should be granted.

## F. Fourteenth Amendment

### 1. Procedural Due Process

To state a claim for procedural due process, there must first be a liberty interest which requires protection.  See generally Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)).  The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered.  Vasquez v. Coughlin, 2 F. Supp. 2d 255, 259 (N.D.N.Y. 1998).  This standard requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life.  See Sandin v. Conner, 515 U.S. 472, 483–84 (1995); Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality.  Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted).  The Second Circuit has not established "a bright line rule that a certain period of [Special Housing Unit] SHU confinement automatically fails to implicate due process rights."  Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004) (citations omitted). Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed

33

record of the conditions of confinement relative to ordinary prison conditions is required."
Id. at 64–65 (citing Colon, 215 F.3d at 232). "[I]n the absence of a detailed factual record,
cases in this Circuit typically affirm dismissal of due process claims where the period of time
spent in SHU was short – e.g. 30 days – and there was no indication [of] . . . unusual
conditions." Harvey v. Harder, No. 09-CV-154 (TJM)(ATB), 2012 WL 4093791, at *6
(N.D.N.Y. July 31, 2012) (citing inter alia Palmer, 364 F.3d at 65–66).

### a. Miller

In this case, Perez has failed to establish a protected liberty interest for his due process
claim against Miller. As a result of Miller's disciplinary hearing disposition, Perez served
thirty days of keeplock confinement. Perez does not allege any facts indicating, in any way,
that during this brief keeplock period, he suffered atypical and significant hardship in
relation to ordinary prison life and the record does not reflect otherwise. Sandin, 515 U.S.
at 483–84. Given the status of the detailed factual record, the brief period of confinement,
and the complete absence of any allegations by Perez that his disciplinary confinement was
anything other than ordinary, Perez has failed to establish a protected liberty interest with
respect to his claim against Miller. Palmer, 364 F.3d at 65–66.

Accordingly, defendants' motion on this ground should be granted.

### b. Keysor

Defendants do not challenge the liberty interest requirement to Perez's due process
claim against Keysor. Rather, they argue that Keysor provided Perez with all the process
that he was due. Perez contends that Keysor deprived him of his procedural due process

rights by not being an impartial hearing officer, denied his request for a nurse as a witness, and failed to provide adequate assistance.

Perez has failed to establish a genuine issue of fact with regards to being denied the appropriate procedural protections. While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural process. Wolff v. McDonnell, 418 U.S. 539, 556 (1974). A prisoner is "entitled to advance written notice . . . ; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

Prisoners have a constitutional right to a fair and impartial hearing officer. See, e.g., Sira, 380 F.3d at 69. However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges . . . [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir. 1996) (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] . . " and the Second Circuit has held that the test is whether there was "'reliable evidence' of the inmate's guilt." Luna v. Pico, 356 F.3d 481, 487–88 (2d Cir. 2004); see also Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1985).

It is clear that Perez's disciplinary disposition was based on reliable evidence of his guilt. The misbehavior report issued against Perez charges Perez with possessing a weapon and smuggling it, which are corroborated by testimonies of Rabideau and

35

Duquette. Despite Perez's persistent attempts to elicit testimony on what actually caused the metal detector to go off, testimonies indicated that a weapon was nevertheless discovered in Perez's legal materials. Even if Duquette or another officer had set of the metal detector, intentionally or unintentionally, this does not vitiate against the fact that a weapon was found in Perez's possession. Thus, Keysor based her disposition on reliable evidence.

Perez was denied the opportunity to call an unidentified nurse as a witness to testify at the hearing. However, "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] . . . on the basis of irrelevance or lack of necessity." Scott v. Kelly, 962 F.2d 145, 146–47 (2d Cir. 1992) (internal quotation marks and citations omitted); see also Richardson v. Van Dusen, 833 F. Supp. 146, 152 (N.D.N.Y. 1993) (quoting Scott v. Kelly). While Keysor denied Perez's request to have a nurse testify, Keysor considered Perez's theory that the misbehavior report was issued in retaliation for filing grievances and noted the nurse did not observe the alleged misbehavior involving the weapon and metal detector. Thus, since this nurse did not witness the events contained in the misbehavior report, her testimony would not assist Perez.

Furthermore, Perez was given the opportunity to extensively question Furnia, Duquette, Rabideau, and Tousignant through Keysor. "While inmates do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials." Rivera v. Wohlrab, 232 F. Supp. 2d 117, 125 (S.D.N.Y. 2002). Thus, Keysor retained the authority and discretion to administer the questioning in a manner she deemed appropriate. A review of the hearing transcript shows that she did permit Perez to question the witnesses extensively, even though not every question was

36

permitted to be asked.  Moreover, when Keysor denied Perez's questions, she provided reasoning for the denial, such as the lack of relevance to the ultimate issue of the validity of the misbehavior report.  See, e.g., Dkt. No. 77-9 at 42, 46, 49, 53.

Moreover, the record belies Perez's contention that he was provided inadequate assistance.  "Prison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges."  Eng v. Coughlin, 858 F.2d 889, 897 (2d Cir. 1988).  Such assistance is intended to aid inmates to "gather[] evidence, obtain[] documents and relevant tapes, and interview[] witnesses.  At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself."  Id. at 898.  In disciplinary settings, inmates requiring counsel may "seek the aid of a fellow inmate, or . . . have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff."  Wolff, 418 U.S. at 570.  Any violations of this right to assistance are reviewed to assess "whether the error was harmless or prejudicial."  Powell v. Coughlin, 953 F.2d 744, 750 (2d Cir. 1991).  During the inception of the hearing on February 6, 2009, Perez advised Keysor that his originally chosen inmate assistance provided him with inadequate assistance.  As a result, Keysor adjourned the hearing so that Perez may receive adequate assistance to prepare his defense.  The hearing was reconvened on February 13, 2009, during which Perez conceded that he received adequate assistance from another inmate assistant on February 9, 2009.  Dkt. No. 77-9 at 36.  This record evidence directly contradicts Perez's allegation that Keysor denied him inmate assistance.

Accordingly, despite Perez's conclusory and unsupported contentions of bias, the record is clear that there is no question of material fact surrounding the process Perez was

provided.  Because Perez received all process to which he was entitled, defendants' motion on this ground should be granted.

### 2.  False Misbehavior Reports

An inmate has a right not to be deprived of a liberty interest without due process. However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest."  Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986)).  "There must be more, such as retaliation against the prisoner for exercising a constitutional right."  Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir.1997) (citing Franco v. Kelly, 854 F.2d 584, 588–90 (2d Cir. 1988)).  Here, as discussed supra, Perez's retaliation claims cannot withstand this motion for summary judgment.  As such, Perez's claims against Duquette and Mussen based on the issuance of false misbehavior reports is also without merit.

Accordingly, defendants' motion on this ground should be granted.

### G.  Qualified Immunity

Defendants claims that even if Perez's constitutional claims against Keysor and Holdridge are substantiated, Keysor and Holdridge are nevertheless entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229–30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 F. App'x 146 (2d Cir. 2003).  However, even if the constitutional privileges "are so clearly

defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230. Here, the second prong of the inquiry need not be addressed with respect to Perez's Fourteenth Amendment claim against Keysor or First and Eighth Amendment claims against Holdridge because, as discussed supra, it has not been shown that either Keysor violated Perez's Fourteenth Amendment rights or Holdridge violated Perez's First or Eighth Amendment rights.

Accordingly, it is recommended that defendants' motion on this ground be granted.


### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 77) be **GRANTED** as to all claims against all defendants except for Perez's (1) Eighth Amendment excessive force claim against defendants Rabideau, Duquette, St. Louis, Furnia, and Tousignant and (2) Eight Amendment medical indifference claim against defendants Furnia and Tousignant.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the

foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation."  N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated: July 25, 2013
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge